# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION AT DAYTON

WILLIAM MILLS,                          :

     Plaintiff,                     :
                              Case No. 3:12cv00104

 vs.                                    :

                                 District Judge Walter Herbert Rice

CAROLYN W. COLVIN,                      :   Chief Magistrate Judge Sharon L. Ovington
Acting Commissioner of the Social
Security Administration,                :

     Defendant.                     :

---

# REPORT AND RECOMMENDATIONS[1]

---

## I.   INTRODUCTION

Plaintiff William Mills applied for Disability Insurance Benefits (DIB) on

November 4, 2004, asserting that he was under a disability due to hydrocephalus, a back

injury, and depression.  (Tr. 112-14, 127, 148).  He claimed that his disability began on

October 15, 2001.  (Tr. 112).  After initial administrative denials of his application, an

Administrative Law Judge (ALJ) held three hearings and later denied Plaintiff's DIB

application.  The Appeals Council granted Plaintiff's request for review and remanded the

matter.  (Tr. 488-90).

On remand, ALJ James I.K. Knapp held a hearing, and again determined that

---

[1]  Attached hereto is NOTICE to the parties regarding objections to this Report and
Recommendations.

Plaintiff was not under a "disability" within the meaning of the Social Security Act. (Tr. 19-36). ALJ Knapp's non-disability determination became the final decision of the Social Security Administration when the Appeals Council denied Plaintiff's request for review. (Tr. 10-13). This Court has jurisdiction to review such final decisions. *See* 42 U.S.C. §§ 405(g), 1383(c)(3).

The case is before the Court upon Plaintiff's Statement of Specific Errors (Doc. #6), the Commissioner's Memorandum in Opposition (Doc. #9), Plaintiff's Reply (Doc. #10), the administrative record, and the record as a whole.

Plaintiff seeks an Order reversing the ALJ's decision and granting him benefits. The Commissioner seeks an Order affirming the ALJ's decision.

## II.   BACKGROUND

### A.   Plaintiff's Vocational Profile and Testimony

On his date last insured, Plaintiff's age (35 years old) placed him in the category of a "younger individual." *See* 20 C.F.R. § 404.1563(c). (Tr. 112, 136). Plaintiff has a high school education and has completed two years of college. (Tr. 133, 154). His past jobs include shipping and receiving clerk; lens polisher; furniture sales representative; and carpet cleaner. (Tr. 128, 149-50, 573).

The ALJ summarized Plaintiff's testimony as follows:

Claimant testified that he last worked in 2003 at a furniture store. He could not concentrate or focus on his job due to medical condition. His brain had been damaged during surgery in 2000. He began having seizures and behavioral outbursts. He ultimately got divorced by his wife due to these outbursts, and he could only see his children under supervision for that

reason.

Secondary to his brain disorder resulting from arrested hydrocephalus, claimant said he suffered from headaches and seizures. He currently had seizures two or three times a month; several months ago they had been as frequent as two or three times a week. The seizures lasted one to two minutes. He took prescribed medication to control them. The headaches were daily. He took aspirin and they went away. He occasionally felt faint with these headaches (three times in the last six months). He also suffered from restless leg syndrome but this was controlled with medication. He had irritable bowel stomach upset symptoms; these too were controlled by medication. He also had low back pain for which he took over the counter medication. He had not undergone a MRI or x-ray.

Claimant, who lives alone, testified that he spent a typical day watching television, reading (five to ten minutes at a time), and going on the internet (five to ten minutes at a time). He took several naps lasting one-half hour to forty-five minutes during the day, and slept six hours at night. He did his own cooking, housework, and laundry. He went grocery shopping twice a month. He went to church twice a month. He visited others once or twice a month. He drove his car about twice a week. He felt safe driving his car because he always had a lot of advanced warning of a seizure.

Claimant estimated that he could stand twenty to thirty minutes at a time and sit one-half hour at a time. He could lift thirty pounds. He reported a current weight of 250 lbs. at 6 ft. 2 inches in height.

(Tr. 20).

B.    **Relevant Medical Opinions**

Turning to the other evidence and information in the administrative record,

Plaintiff and the ALJ have provided informative and detailed descriptions of Plaintiff's

complicated medical history. *See* Doc. #6 at Tr. 3-13; Tr. 23-25 (and records cited

therein). In light of this, and upon consideration of the complete administrative record,

additional detailed discussion of the record would be unnecessarily duplicative, however,

a general identification of the medical sources upon whom the parties rely will help frame

further review and is therefore provided below.

**David R. Little, M.D.**

Plaintiff relies on the opinion of his treating primary care physician, Dr. Little.

Plaintiff has treated with Dr. Little from April 19, 2005, until at least January 26, 2009.

(Tr. 340-61, 401-11, 527-37). Dr. Little's office notes show that he had treated Plaintiff

for hydrocephalus, seizure disorder, vascular headaches, a cystic mass on his corpus

callosum, and depression. (*Id.*).

On March 30, 2006, Dr. Little found that Plaintiff had a deteriorating condition

with frequent and ongoing symptoms of vertigo; insomnia; headaches and short-term

memory loss accompanied by depression; irritability; and unpredictable behavior. He

stated that, as a result of those issues, it was his professional opinion that Plaintiff was

"clearly unable to perform any form of gainful employment." (Tr. 344).

Dr. Little also completed interrogatories on March 30, 2006, as to Plaintiff's

mental and physical impairments. (Tr. 345-49, 350-54). Dr. Little reported that he

started treating Plaintiff in February 2006 following the departure of Plaintiff's former

family physician, who had provided care since March 2004. Dr. Little noted that he had

all the previous treatment records. (Tr. 345). Dr. Little opined that Plaintiff was unable

to respond appropriately to supervision, co-workers, and customary work pressures owing

to "cognitive impairments, irritability, personality disturbances impair his ability to relate

to others." (Tr. 347). According to Dr. Little, Plaintiff was also unable to do the

4

following: withstand the pressures of meeting normal standards of work productivity and work accuracy; sustain attention and concentration on his work to meet normal standards of work productivity and work accuracy; demonstrate reliability; maintain attention and concentration for extended periods; perform activities within a schedule; maintain regular attendance, and be punctual within customary tolerances; and complete a normal work day or work week without interruptions from psychologically and/or physically based symptoms at a consistent pace without unreasonable numbers and lengths of rest periods. (Tr. 347-49).

As to Plaintiff's physical limitations, Dr. Little opined that Plaintiff could not lift or carry any weight during a work day due to symptoms of hydrocephalus (including dizziness, and headaches which are aggravated by physical exertion). (Tr. 350-51). Plaintiff could stand/walk for four hours out of eight, and could stand/walk uninterrupted for one hour. His headaches might occasionally affect his ability to sit. (Tr. 351). He was never to climb, balance, stoop, crouch, kneel, or crawl. His eyesight was deteriorating. Pushing and pulling also caused headaches and dizziness. (Tr. 352). He was unable to work around machinery and heights. Dr. Little stated, "[c]ognitive impairments are significant and prohibit focused mental activity." (Tr. 353). Dr. Little concluded that Plaintiff could perform sedentary work activity, but he would be absent from work more than three times a month. (Tr. 354).

On August 15, 2007, Dr. Little prepared a medical opinion on behalf of the Greene Metropolitan Housing Authority. Dr. Little reported that Plaintiff suffers from

hydrocephalus, which causes unpredictable behavior, including rage outbursts. As a result of his condition, Plaintiff is no longer medically capable of maintaining employment or meeting family responsibilities. However, according to Dr. Little, Plaintiff will be able to live independently and safely. He is able to manage his own meals, home care, and self care without significant risk. Plaintiff's behavior and rage outbursts are episodic and unpredictable. Dr. Little opined that all visits with his children be supervised in the presence of another adult. Rage outbursts have been observed 1-2 times per month. There has been no recent change in the frequency of these episodes. Plaintiff should be capable of managing his own financial affairs, including benefits. Plaintiff should be capable of managing his own medications. Dr. Little concluded that Plaintiff was not a candidate for vocational rehabilitation at that time because of his concentration problems and unpredictable behavior. (Tr. 438).

### Nicholas A. Doninger, Ph.D.

Plaintiff underwent a comprehensive neuropsychological evaluation on September 18, 2006, by clinical psychologist Dr. Doninger. Plaintiff was referred by Dr. Little in order to evaluate his cognitive complaints. (Tr. 428). Plaintiff reported that he was hit in the head by a baseball and suffered a closed head injury in 1982. During the sixth grade, he exhibited flu-like symptoms, balance problems, problems with passing out, and a combative attitude. (*Id.*). He underwent a ventriculoperitoneal shunt implant surgery. It was revised three times and then the shunt was replaced in 2000. He experienced intracerebral hemorrhaging during the surgery which was shown on neuroimaging. Since

6

then, he had episodes of epigastic rising to his head causing him to feel like he will pass

out and requiring him to lie down.  He also reported "zoning out" during these episodes,

as well as dizziness, nausea, and headaches.  He had these episodes one to eight times a

month.  Plaintiff also experienced rage outbursts, hostility, and aggression since the shunt

replacement.  Effexor had helped stem the intensity of the episodes.  He also reported

problems with concentration, attention, and becoming distracted.  Plaintiff had headaches

almost daily, and acknowledged feeling depressed with low levels of energy and poor

concentration.  (Tr. 429-30).

Dr. Doninger reviewed neuroimaging/diagnostic studies and found the 2002 head

CT scan demonstrated "mild peripheral and central atrophy."  The head CT scan in 2005

showed no hydrocephalus, but the MRI revealed "an ovoid cystic mass within the region

of the genu of the corpus callosum….The cystic mass causes some splaying of the frontal

horns with the remainder of the body of the corpus callosum evidencing a rather

attenuated appearance….Tiny amounts of hyperintensities were observed adjacent to the

shunt tube and margin of the cystic lesion as well as within the left frontal centrum

semiovale."  (Tr. 430) .

During mental status examination, Dr. Doninger observed Plaintiff to be

dysthymic.  He put forth good effort on testing, but often took a long time thinking about

the response.  (Tr. 432).  Plaintiff scored in the High Average range in Verbal IQ, and his

Performance IQ was average.  His WAIS-III Working Memory Index score fell in the

High Average range.  Processing speed was in the Low Average range and "below

7

expectations given his measured level of general aptitude."  (Tr. 433).  On the supraspan

list-learning test, his "[p]erformance was facilitated by the provision of category cues

suggestive of inefficient retrieval rather than an inability to consolidate newly learned

information." (*Id.*).  His fine motor dexterity was in the moderately impaired range

bilaterally.  (Tr. 434).  Dr. Doninger noted:

> His valid PAI clinical scale indicates significant distress with particular
> concern over physical functioning.  His physical problems have left him
> unhappy and disrupted important social roles, which contributes an
> additional source of stress.  His responses also disrupted sleep pattern,
> reduced energy, and weight loss.  His thought processes are marked by
> confusion and distractibility.  Emotion lability is also evident in his profile,
> including rapid and extreme mood swings and poorly controlled anger.

(Tr. 434).

In the section of Plaintiff's neuropsychological evaluation titled "Summary &

Conclusions," Dr. Doninger stated:

> Disruption of inhibitory and emotional mechanisms with impulsive and
> socially inappropriate behavior as well as reports of perseverative or
> inflexible behavior are suggestive of damage to prefrontal brain regions for
> which there is supporting neuroradiological evidence.  Alternatively, abrupt
> episodes of anger, which have also been noted to occur during the night,
> have coincided with spells involving a rising epigastric sensation, dizziness,
> light-headedness, and nausea following shunt replacement in 2000 and
> could reflect ictal or post ictal aggression.  Such behavior and auras of
> epigastric rising are common among those with epileptogenic foci within
> the mesial temporal region; however, his neurocognitive profile, including
> relatively intact memory functions does not fully support this possibility.
> Regardless of the etiology, his behavioral changes will likely represent the
> most challenging barrier to successful reintegration into the work
> environment.

(Tr. 436).  Dr. Doninger recommended that Plaintiff continue medication management of

8

symptoms, individual psychotherapy to help him with coping skills.  He also referred Plaintiff for vocational counseling, and EEG monitoring.  (*Id.*).  He found that Plaintiff would need to work in a quiet environment with no distractions, be able to focus on one task at a time, and have adequate opportunities to take breaks.  (Tr. 437).

### William O. Smith, M.D.

 Dr. Smith examined Plaintiff on behalf of the Ohio Bureau of Disability Determination ("BDD") on July 7, 2008.  (Tr. 450-62).  Upon examination, Plaintiff exhibited some diminished reflexes, as well as a decreased range of motion of his dorsal lumbar spine, right hip, and left hip.  Dr. Smith concluded that Plaintiff has "arrested hydrocephalus, secondary to head trauma in childhood.  He has intermittent episodes of headache, dizziness, and occasional vomiting.  He may have intermittent partial obstruction of his shunt.  He is being investigated for possible seizures.  He also had a lower back injury in 1996 with residual low back pain from time to time.  He has no leg pain.  He has restriction of motion of his lumbar spine in both hips.  His shunt pumps normally.  He has no focal neurologic deficit.  He alleges long-lasting short term memory changes as a result of his hydrocephalus.  He also has restless leg syndrome and hypertension of a recent onset."  (Tr. 452).

As to Plaintiff's functional limitations, Dr. Smith opined that Plaintiff could lift up to ten pounds frequently and twenty pounds occasionally, and carry up to ten pounds occasionally.  (Tr. 457).  He could sit for two hours without interruption, stand for up to thirty minutes without interruption, and walk for up to thirty minutes without interruption.

He could sit for six hours, stand for two hours, and walk for two hours out of an eight hour work day.  (Tr. 458).  He could occasionally climb stairs, ramps, ladders, or scaffolds; balance; stoop; kneel; crouch; and crawl.  (Tr. 460).  He was never to be around unprotected heights and could only occasionally be around moving mechanical parts.  He was restricted to a moderate noise level.  (Tr. 461).

### Mark D. Hammerly, Ph.D.

Dr. Hammerly evaluated Plaintiff on July 10, 2008, at the request of the Ohio BDD.  (Tr. 439-49).  Plaintiff reported that he believed he sustained brain damage during surgery for a shunt revision in 2000 because blood came into contact with his brain tissue and there was formation of scar tissue in his brain.  He said that since then he has had memory loss, concentration problems, and mood swings.  He said that he had been taking antidepressant medications, but that he had quit taking them six months earlier because the medications made him feel sick.  He said that he had been receiving counseling at his church for about nine months.  Plaintiff also reported that he visited with his family and friends.  (Tr. 440).  Dr. Hammerly noted that Plaintiff had moderate eye contact and walked with a limp.  (Tr. 441).  Plaintiff spent his time reading, listening to music, and watching television.  He did his household chores.  (Tr. 443).

Dr. Hammerly diagnosed an adjustment disorder with depressed mood and assigned Plaintiff a GAF score of 61.[2]  (Tr. 445).  He concluded that Plaintiff's depression

---

[2]"GAF," Global Assessment Functioning, is a tool used by health-care professionals to assess a person's psychological, social, and occupational functioning on a hypothetical continuum of mental illness.  It is, in general, a snapshot of a person's "overall psychological functioning" at or near the time

caused essentially mild limitations and that he would be able to understand, remember, and carry out simple repetitive tasks, which did not require complicated or detailed verbal instructions or procedures.  Dr. Hammerly also opined that Plaintiff demonstrated no problems with attention or concentration during a clinical interview and mental status examination, and that his ability to understand, remember, and follow instructions appeared to be unimpaired.  He further opined that Plaintiff could relate to coworkers and supervisors sufficiently to perform simple repetitive tasks, and that Plaintiff's ability to withstand the stress and pressure associated with day-to-day work activity was mildly impaired.  (*Id.*).

### Karl Manders, M.D., Medical Expert

During the ALJ's hearing on May 10, 2010, a record-reviewing neurological surgeon and pain medicine specialist, Dr. Manders, engaged in a lengthy description of the record.  (Tr. 561-66).  Dr. Manders testified that the results of Dr. Doninger's neuropsychological evaluation were critical in understanding this case.  (Tr. 564).  Dr. Manders opined that Dr. Doninger's assessment is "closer to what's going on than Dr. Little['s] who is a family physician.  I think Dr. Little's report that he can't do anything is not based on any physical findings that I have seen reported at all.  There's no evidence of any neurological deficit."  (Tr. 565).  He noted that Plaintiff had above average cognition

---

of the evaluation.  *See Martin v. Commissioner*, 61 Fed.Appx. 191, 194 n.2 (6th Cir. 2003); *see also* Diagnostic and Statistical Manual of Mental Disorders, 4th ed., Text Revision ("DSM-IV-TR") at 32-34. A GAF score of 61-70 indicates that a person has only mild symptoms or some difficulty with social, occupational or school functioning, but such a person can generally functioning pretty well and have some meaningful interpersonal relationships. DSM-IV-TR at 34.

per testing.  (*Id.*).  He opined that Plaintiff's various symptoms were most likely the result of  psychological issues.  (*Id.*).

Dr. Manders found that there was no medical explanation for Plaintiff's reported seizure condition in the record.  (Tr. 561, 566).  The EEG of record was normal.  (*Id.*).  Dr. Manders also noted that while Plaintiff could be having migraine headaches, the headaches as described sounded more like tension headaches.  (Tr. 564).  Dr. Manders testified that from a physical perspective, he saw no reason for any lifting restriction (only a hazard restriction).  (Tr. 562, 566, 568).

## III.    ADMINISTRATIVE REVIEW

### A.    "Disability" Defined

The Social Security Administration provides DIB to individuals who are under a "disability," among other eligibility requirements.  *Bowen v. City of New York*, 476 U.S. 467, 470 (1986); *see* 42 U.S.C. § 423(a)(1)(D).  The term "disability" – as defined by the Social Security Act – has specialized meaning of limited scope.  It encompasses only those who suffer from a medically determinable physical or mental impairment severe enough to prevent them from engaging in substantial gainful activity.  *See* 42 U.S.C. § 423(d)(1)(A); *see also Bowen*, 476 U.S. at 469-70.  A DIB applicant bears the ultimate burden of establishing that he or she is under a "disability."  *Key v. Callahan*, 109 F.3d 270, 274 (6th Cir. 1997); *see Wyatt v. Sec'y of Health & Human Servs.*, 974 F.2d 680, 683 (6th Cir. 1992); *see also Hephner v. Mathews*, 574 F.2d 359, 361 (6th Cir. 1978).

### B.    ALJ Knapp's Decision

ALJ Knapp resolved Plaintiff's disability claim by using the five-Step sequential evaluation of evidence required by the Regulations.  *See* Tr. 20-22; *see also* 20 C.F.R. § 404.1520(a)(4).

At Step 2, the ALJ concluded, in pertinent part, that Plaintiff had the following severe impairments: a history of arrested hydrocephalus with recurrent headaches, a seizure disorder NOS, moderate obesity with lumbar strain, and a depressive disorder NOS.  At Step 3 the ALJ concluded Plaintiff did not have an impairment or combination of impairments that met or equaled the criteria in the Commissioner's Listings.[3]  At Step 4 he concluded that Plaintiff retained the residual functional capacity ("RFC") to perform a limited range of medium work,[4] subject to the following additional exertional and nonexertional limitations and/or restrictions:

> (1) no climbing of ladders or scaffolds; (2) no job requiring a good ability to maintain balance (3) no work at unprotected heights or around moving machinery; (4) no more than occasional crawling or stooping; (5) no more than occasional contact with the public or with co-workers; (6) no complex instructions; and (7) only low stress work activity (i.e., no job involving fixed production quotas or otherwise involving above average pressure for production, work that is other than routine in nature, or work that is hazardous)

(Tr. 27).  The ALJ further found that Plaintiff has no past relevant work (Tr. 35), but the vocational expert testified that Plaintiff's past relevant work included jobs as a shipping

---

[3]The Listings are found at 20 C.F.R. Part 404, Subpart P, Appendix 1.

[4]The Regulations define medium work as involving the ability to lift "no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds . . . ." 20 C.F.R. §404.1567(c).

and receiving clerk; lens polisher; furniture sales representative; and carpet cleaner.  (Tr. 573).  At Step 5 the ALJ found that, through the date last insured, Plaintiff could perform a significant number of jobs in the national economy.

The ALJ's findings throughout his sequential evaluation led him to ultimately conclude that Plaintiff was not under a disability, and thus not eligible for DIB.  (Tr. 19-36).

## IV.    JUDICIAL REVIEW

Judicial review of an ALJ's decision proceeds along two lines: "whether the ALJ applied the correct legal standards and whether the findings of the ALJ are supported by substantial evidence." *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (6th Cir. 2009); *see Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 745-46 (6th Cir. 2007).

Review for substantial evidence is not driven by whether the Court agrees or disagrees with the ALJ's factual findings or by whether the administrative record contains evidence contrary to those factual findings.  *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007); *see Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 389-90 (6th Cir. 1999).  Instead, the ALJ's factual findings are upheld if the substantial evidence standard is met – that is, "if a 'reasonable mind might accept the relevant evidence as adequate to support a conclusion.'" *Blakley*, 581 F.3d at 407 (quoting *Warner v. Comm'r of Soc. Sec.*, 375 F.3d 387, 390 (6th Cir. 2004)).  Substantial evidence consists of "more than a scintilla of evidence but less than a preponderance . . ." *Rogers*, 486 F.3d at 241.

14

The second line of judicial inquiry – reviewing for correctness the ALJ's legal criteria – may result in reversal even if the record contains substantial evidence supporting the ALJ's factual findings. *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 651 (6th Cir. 2009); *see Bowen*, 478 F.3d at 746. "[E]ven if supported by substantial evidence, 'a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.'" *Rabbers*, 582 F.3d at 651 (quoting in part *Bowen*, 478 F.3d at 746, and citing *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 546-47 (6th Cir. 2004)).

## V.      DISCUSSION

### A.      The Parties' Contentions

Plaintiff contends that ALJ Knapp erred in his evaluation of treating physician, Dr. Little's opinions.  (Doc. #6, *PageID##* 52-58, Doc. #10, *PageID##* 75-78).  According to Plaintiff, ALJ Knapp erred in rejecting the opinion of Dr. Little and relying on the findings of Dr. Doninger to do so.  (*Id.* at *PageID#* 52).  Plaintiff argues that ALJ Knapp's RFC determination does not include the restrictions of Dr. Doninger, and was not consistent with the Appeals Council remand.  (*Id.* at *PageID#* 54).  Plaintiff also argues that the ALJ erroneously relied on the opinions of Drs. Hammerly and Smith.  (*Id.* at *PageID#* 57).

Conversely, the Commissioner contends that ALJ Knapp's decision denying benefits to Plaintiff is supported by substantial evidence and he reasonably considered Dr.

Little's opinion that Plaintiff was disabled. (Doc. #9 at *PageID#* 69).  The Commissioner further contends that there is nothing in Dr. Doninger's report that supports Dr. Little's extreme conclusions of disabling symptoms and limitations, and that the medical expert Karl Manders, M.D., a neurological surgeon, made this very point at the final administrative hearing.  (*Id.*).  Accordingly, the Commissioner asserts that ALJ Knapp's decision should be affirmed.  (*Id.*)

### B.  The Opinion of the Treating Physician

The Sixth Circuit has held that claimants are "entitled to receive good reasons for the weight accorded their treating sources independent of their substantive right to receive disability benefits." *Smith v. Comm'r of Soc. Sec.*, 482 F.3d 873, 875–76 (6th Cir. 2007); *see Cole v. Astrue*, 661 F.3d 931, 937–38 (6th Cir. 2011); *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004).  "[T]he procedural requirement exists, in part, for claimants to understand why the administrative bureaucracy deems them not disabled when physicians are telling them that they are." *Smith*, 482 F.3d at 876; *see Gayheart v. Comm'r of Soc. Sec.*, 710 F.3d 365 (6th Cir. 2013).

Generally, "the opinions of treating physicians are entitled to controlling weight." *Cruse v. Comm'r of Soc. Sec.*, 502 F.3d 532, 540 (6th Cir. 2007) (citing *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529-30 (6th Cir. 1997)).  However, '[i]t is an error to give an opinion controlling weight simply because it is the opinion of a treating source if it is not well-supported by medically acceptable clinical and laboratory diagnostic techniques or if it is inconsistent with the other substantial evidence in the case record.'"

16

*Blakley*, 582 F.3d at 406 (quoting Soc. Sec. Rul. 96-2p, 1996 WL 374188, at *2 (July 2, 1996)).  In *Wilson*, the Sixth Circuit noted that a treating physician's opinion can be discounted if: (1) it is not supported by medically acceptable clinical and laboratory diagnostic techniques; (2) it is inconsistent with substantial evidence in the record; (3) it does not identify the evidence supporting its finding; and (4) it fares poorly when applying the factors listed in 20 C.F.R. § 404.1527(d)(2), which include, *inter alia*, the length and frequency of examinations, the amount of evidence used to support an opinion, the specialization of the physician, and consistency with the record.  *Wilson*, 378 F.3d at 546.

Finally, the Commissioner reserves the power to decide certain issues, such as a claimant's residual functional capacity.  20 C.F.R. § 404.1527(e).  Although the ALJ will consider opinions of treating physicians "on the nature and severity of your impairment(s)," opinions on issues reserved to the Commissioner are generally not entitled to special significance.  20 C.F.R. § 404.1527(e); *Bass v. McMahon*, 499 F.3d 506, 511 (6th Cir. 2007).

As to non-treating medical sources, the Regulations do not permit an ALJ to automatically accept or reject their opinions.  *See id*. at *2-*3.  The Regulations explain, "[i]n deciding whether you are disabled, we will always consider the medical opinions in your case record together with the rest of the relevant evidence we receive."  20 C.F.R. § 404.1527(b).  To fulfill this promise, the Regulations require ALJs to evaluate non-treating medical source opinions under the factors set forth in § 404.1527(d) including, at

17

a minium, the factors of supportability, consistency, and specialization.  *See* 20 C.F.R. §

404.1572(f); *see also* Soc. Sec. Ruling 96-6p, 1996 WL 374180 at *2-*3.

### C.  Analysis

In considering Dr. Little's opinion, ALJ Knapp reviewed the record and medical

evidence before him and concluded that the opinion was entitled to "little" weight.

Specifically, the ALJ stated:

> Dr. Little's opinion is given little weight, because it is inconsistent with
> other substantial medical evidence in the record, and it is not supported by
> the objective medical evidence and clinical findings; specifically, the
> findings by Dr. White, Dr. Smith, Dr. Hammerly, and Dr. Doninger . . . and
> by the expert medical opinion of Dr. Manders . . .  Dr. Manders reasonably
> pointed out in his testimony that Dr. Little's opinion is not supported by
> related findings in the record.  Furthermore, Dr. Little is not a mental health
> specialist, and his assessment relies largely on an erroneous assumption that
> the claimant has a cognitive disorder and a belief that exertion would
> aggravate the claimant's hydrocephalic related symptoms of dizziness and
> headaches.  Dr. Manders, a neurologist, does not share that concern.
> Further, the testimony at the hearing reflects that neither dizziness or
> headaches are serious problems from a functional perspective, the former
> seldom occurring and the latter responding quickly to aspirin.

(Tr. 32) (citation to record omitted).

Plaintiff contends that pursuant to Soc. Sec. Ruling 96-2p, even if Dr. Little's

opinion was not entitled to controlling weight, "it was certainly entitled to deference."

*See* Doc. # 6 at *PageID#* 57, Doc. # 10 at *PageID#* 77.  Plaintiff alleges disability due to

his chronic medical history involving hydrocephalus.  (Tr. 127).  The medical evidence

reveals that shunts were inserted in his brain when he was twelve years of age.  (Tr. 234,

252).  Subsequent revisions were performed over the years, and Scott West, D.O., a

neurosurgeon, performed a repair surgery on October 26, 2000.  (Tr. 234).  Plaintiff

testified that he is disabled due to: significant problems with memory and concentration;

trouble maintaining focus; behavioral changes; depression; chronic headaches; and some

possible seizure activity.  (Tr. 548, 552, 553, 557).

     In addition, Dr. Little's three consistent opinions stating that Plaintiff is disabled

due to the combination of his physical, cognitive, and psychological impairments are

supported by the objective medical evidence.  Dr. Little reported that Plaintiff's

symptoms include vertigo, insomnia, headaches, short-term memory loss, depression,

irritability, and unpredictable behavior.  (Tr. 344, 345-49, 350-54, 438).  Sherrie Morgan,

M.D., who treated Plaintiff for his primary care in 2004 and 2005, opined in December

2004 and May 2005 that Plaintiff is not able to work due to severe vertigo, dizziness with

exercise, fatigue, and light-headedness, along with his symptoms associated with

depression and a possible mood disorder.  (Tr. 252-55, 256-25).  In a questionnaire

completed by Dr. West on December 13, 2004, he stated that "[d]ue to liability purposes,

I do not feel comfortable saying this patient can work."  (Tr. 315).  During the

neuropsychological evaluation performed by Dr. Doninger, he found that Plaintiff's valid

personality assessment inventory tests indicated significant distress with particular

concern over physical functioning.  (Tr. 432).  During the examination, Plaintiff's

responses showed depressive symptoms, including a disruptive sleep pattern, reduced

energy, and weight loss.  (Tr. 432-36).  These findings support Dr. Little's opinion.

     Dr. Little's opinion is also supported by objective tests of record, including an

19

MRI of the brain taken April 25, 2005, which showed post-operative abnormalities within the left frontal centrum semiovale.  There is also abnormality in regard to his pituitary tissue, as well as an ovoid cystic mass which had not been seen before and is centered in the genu of the corpus callosum.  (Tr. 302-03).  An MRA of Plaintiff's head taken that same day showed basilar artery stenosis.  The right segment of the posterior cerebral artery is not visualized and likely absent.  (Tr. 303).  Dr. Morgan felt that the basilar artery stenosis may be causing a "decreased oxygen flow to his brain."  (Tr. 253).  A January 7, 2007 CT scan of Plaintiff's head revealed the cyst area that was thought to possibly "represent a focal area of macrocystic encephalomalacia."  (Tr. 394).

The record makes clear that Dr. Little was responsible for coordinating Plaintiff's care with the other specialists of record, and that he was well-aware of Plaintiff's diagnoses and treatments provided by his other health care providers.  *See* 20 C.F.R. § 404.1527(d)(2); *Blakley*, 582 F.3d at 406.  Based on his long-term treatment relationship with Plaintiff, Dr. Little reasonably opined that Plaintiff was only able to perform the exertional requirements of sedentary work on a sustained basis.  (Tr. 354).  This opinion was wrongly accorded minimal or no deference by the ALJ.  Dr. Little's opinion is supported by objective medical data and is consistent with the other evidence of record.

Moreover, the Court finds that the ALJ erred in his failure to appropriately weigh and give good reasons for not providing controlling weight to the findings of Dr. Little.  If the ALJ finds that the opinion of a treating source is "well-supported by medically

20

acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence . . . of record," the ALJ should give the opinion controlling weight. 20 C.F.R. § 404.1527(c)(2). Recently, in *Gayheart,* the Sixth Circuit further clarified the procedure and reemphasized the purpose of the treating physician rule. *See Gayheart*, 710 F.3d 365. The Sixth Circuit found that the ALJ did not provide good reasons for why he found that the opinion of the plaintiff's treating physician was not well-supported by objective findings, was not consistent with other substantial evidence of record, and was entitled to "little weight." *Id.* at 376.

In *Gayheart*, the Sixth Circuit also found that the ALJ did not indicate that he considered § 404.1527(c) factors of supportability, consistency, and specialization, when weighing the doctor's opinions and found that "[a] more rigorous scrutiny of the treating-source opinion than the nontreating and nonexamining opinions is precisely the inverse of the analysis that the regulation requires." *Id.* at 379. (citing 20 C.F.R. 404.1527(c); Soc. Sec. Rul. No. 96–6p, 1996 WL 374180, at *2). The Court also noted that while the regulations – under some circumstances, after a properly balanced analysis – allow ALJs to give more weight to the consultative doctor's opinion than the treating physician's opinion, "the regulations do not allow the application of greater scrutiny to a treating-source opinion as a means to justify giving such an opinion little weight." (*Id.*).

In this case, in assessing the opinions of Drs. Morgan, Little, and Smith, the ALJ found they:

> do not satisfy the regulatory requirements . . . . Their opinions lack supportability

21

in, or consistency with, the objective medical evidence and claimant's actual history.  The opinions [are] not supported by the objective medical evidence in the record and they are inconsistent with the substantial clinical findings which do not establish a limitations that would restrict the claimant count a reduced range of work at the medium exertion level.

(Tr. 34).  The ALJ's finding, however, is ambiguous as he does not indicate how or why he has reached this conclusion.  *See Gayheart,* 710 F.3d at 377 ("the [ALJ's] conclusion that [the treating physician's] opinions 'are not well-supported by any objective findings' is ambiguous").  For example, the ALJ does not specify or otherwise discuss what objective evidence of record purportedly contradicts the opinion of Dr. Little.  As highlighted in *Gayheart,* for the treating physician rule to have the meaning and practical force prescribed in the regulation, the opinion of a treating source may not be afforded little or no weight simply because it conflicts with the opinions of nontreating and nonexamining doctors.  To hold otherwise, "would turn on its head the regulation's presumption of giving greater weight to treating sources because the weight of such sources would hinge on their consistency with nontreating, nonexamining sources."  *Id.* As such, the Court finds that the ALJ did not properly and fully apply the proper legal standards when reviewing the opinion of Plaintiff's treating physician, Dr. Little.

Accordingly, for all of the above reasons, Plaintiff's argument is well taken.

## VI.     REMAND IS WARRANTED

If the ALJ failed to apply the correct legal standards or his factual conclusions are not supported by substantial evidence, the Court must decide whether this error demands that the case be remanded.  The Sixth Circuit "has made clear that '[it] do[es] not hesitate

22

to remand when the Commissioner has not provided good reasons for the weight given to a treating physician's opinion and [the Sixth Circuit] will continue remanding when [it] encounter[s] opinions from ALJ's that do not comprehensively set forth the reasons for the weight assigned to a treating physician's opinion." *Cole,* 661 F.3d at 939 (quoting *Hensley v. Astrue,* 573 F.3d 263, 267 (6th Cir. 2009) (citation and internal quotation marks omitted)).  The Court will not remand the case if the violation is harmless error.  A violation of the good reasons rule can be deemed "harmless error" if:

> "(1) a treating source's opinion is so patently deficient that the Commissioner could not possibly credit it; (2) if the Commissioner adopts the opinion of the treating source or makes findings consistent with the opinion; or (3) where the Commissioner has met the goal of § 1527(d)(2) . . . even though she has not complied with the terms of the regulation."

*Friend v. Comm'r of Soc. Sec.,* 375 Fed. Appx. 543, 551 (6th Cir. 2010) (citation omitted).

Under Sentence Four of 42 U.S.C. § 405(g), the Court has authority to affirm, modify, or reverse the Commissioner's decision "with or without remanding the cause for rehearing." *Melkonyan v. Sullivan*, 501 U.S. 89, 99 (1991).  Remand is appropriate if the Commissioner applied an erroneous principle of law, failed to consider certain evidence, failed to consider the combined effect of impairments, or failed to make a credibility finding.  *Faucher v. Sec'y of Health & Human Servs.*, 17 F.3d 171, 176 (6th Cir. 1994).

A judicial award of benefits is unwarranted in the present case because the evidence of disability is not overwhelming, and because the evidence of a disability is not

23

strong while contrary evidence is weak. *See Faucher*, 17 F.3d at 176.

Plaintiff, however, is entitled to an Order remanding this case to the Social Security Administration pursuant to Sentence Four of § 405(g) due to the problems set forth above. On remand, the ALJ should be directed to (1) re-evaluate the medical source opinions of record under the legal criteria set forth in the Commissioner's Regulations, Rulings, and as required by case law; and (2) reconsider, under the required sequential evaluation procedure, whether Plaintiff was under a disability and thus eligible for DIB. Accordingly, the case should be remanded to the Commissioner and the ALJ for further proceedings consistent with this Report and Recommendations.

## IT IS THEREFORE RECOMMENDED THAT:

1.  The Commissioner's non-disability finding be vacated;

2.  No finding be made as to whether Plaintiff William Mills was under a "disability" within the meaning of the Social Security Act;

3.  This case be remanded to the Commissioner and the Administrative Law Judge under Sentence Four of 42 U.S.C. § 405(g) for further consideration consistent with this Report and Recommendations; and

4.  The case be terminated on the docket of this Court.

May 28, 2013                                   _____s/ Sharon L. Ovington_____
                                                        Sharon L. Ovington
                                           Chief United States Magistrate Judge

## NOTICE REGARDING OBJECTIONS

Pursuant to Fed. R. Civ. P. 72(b), any party may serve and file specific, written objections to the proposed findings and recommendations within fourteen (14) days after being served with this Report and Recommendations.  Pursuant to Fed. R. Civ. P. 6(d), this period is extended to seventeen (17) days because this Report is being served by one of the methods of service listed in Fed. R. Civ. P. 5(b)(2)(C), (D), (E), or (F).  Such objections shall specify the portions of the Report objected to and shall be accompanied by a memorandum of law in support of the objections.  If the Report and Recommendations are based in whole or in part upon matters occurring of record at an oral hearing, the objecting party shall promptly arrange for the transcription of the record, or such portions of it as all parties may agree upon or the Magistrate Judge deems sufficient, unless the assigned District Judge otherwise directs.  A party may respond to another party's objections within fourteen (14) days after being served with a copy thereof.

Failure to make objections in accordance with this procedure may forfeit rights on appeal.  *See United States v. Walters,* 638 F. 2d 947 (6th Cir. 1981); *Thomas v. Arn,* 474 U.S. 140 (1985).